[Crim. No. 6147. First Dist., Div. Four. Aug. 2, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD GREEN, Defendant and Appellant.

Barry Mark Regar, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Daniel J. Kremer, Michael C. Gessford and J. Patrick McCarthy, Deputy Attorneys General, for Plaintiff and Respondent.

RATTIGAN, J.—Counts I and III of an information charged defendant with having committed two separate burg-

laries (Pen. Code, § 459), counts II and IV with having received (*id.*, § 496) property stolen in each of the respective burglaries. After a jury trial, defendant was acquitted of burglary but found guilty of receiving as charged in both counts II and IV. He appeals from the judgment of conviction,[1] contending that the admission in evidence of certain items of stolen property was constitutional error because the items were obtained by the police in an illegal search.

The burglaries occurred when separate offices occupied by Erhard F. Koosmann and Charles W. Funaro, respectively, were forcibly entered during the night of January 16-17. Both offices were in the same building, which was located at 11350 Ventura Boulevard in the City of Los Angeles. Several items of furniture, office equipment and other property were stolen from each office, including a travel clock of Koosmann's and a stapler and a bag of "pseudo gold nuggets" owned by Funaro.

As will appear, police officers recovered the nuggets in a search of defendant's person when he was arrested for the burglaries, the clock and stapler when they searched defendant's motel room immediately thereafter. At the trial, defendant objected to the admission of these items upon the grounds that both the arrest and the room search were illegal. The trial court thereupon heard extensive testimony concerning both, on *voir dire* and outside the presence of the jury.

Officer Slattery, of the Los Angeles Police Department, testified in the *voir dire* proceedings as follows: He was assigned to investigate the burglaries. On January 25, he and his partner learned from Mrs. Dorothy Prossner that a man known to her as "Bob" had offered to sell her two office machines. Mrs. Prossner had become suspicious because of the low selling price. Through a friend in the office equipment business, she had traced the machines to Koosmann through their serial numbers, and learned that they had been stolen in a burglary of his office. She had then returned the machines to "Bob" and called the police. Mrs. Prossner, who was described in the testimony as an "ordinary citizen," had not previously been a police informant.

From the serial numbers given by Mrs. Prossner, Officer Slattery also recognized the machines as part of the loot from the Koosmann burglary. Mrs. Prossner directed him to

---

[1]Defendant also purportedly appealed from the lower court's order denying his motion for new trial. The appeal must be dismissed: the order is nonappealable. (Pen. Code, § 1237; *People* v. *Campuzano* (1967) 254 Cal.App.2d 52, 53 [fn. 1] [61 Cal.Rptr. 695].)

"Bob's" residence, where he knocked and was admitted by Mrs. Lynn Taylor. Entering, Slattery saw John Taylor, whom he knew. The officer also knew Taylor by the name of "Bob Ward." Slattery also saw in the Taylor residence two dictating machines of a type which had been stolen from Funaro's office. The officer then arrested both Taylors for burglary.

Interrogated at the scene of his arrest after he had been advised of his rights, Taylor said that he had bought the dictating machines and other office equipment from "some fellow in a bar." At the police station somewhat later, he stated that he wanted to tell the truth and that he had obtained the dictating machines from defendant. Taylor also told the police that he had seen several other items of property in defendant's motel room which, he felt, did not belong to defendant. He also quoted defendant as having said that he (defendant) had "obtained" the property, including the items that Taylor had allegedly bought from him, from the building at 11350 Ventura Boulevard. Taylor had not previously been a police informant.

Taylor described defendant to the officers, told them where he worked, and pointed out his motel. The motel was located at 11480 Ventura Boulevard, which was in Los Angeles and in the immediate vicinity of the two burglaries. Defendant was not at the motel when Officer Slattery called there after interviewing Taylor. The motel manager also described defendant and identified his place of employment, which was an auto leasing agency in the City of Burbank. The officers, still on January 25, went to the Burbank address and waited until defendant arrived in an automobile.

Officer Slattery testified that "I approached the vehicle and I identified myself as a police officer and asked the occupant if he was Eddie Green. He stated that he was. At this time I advised Mr. Green that he was under arrest for burglary and that he had certain constitutional rights. I advised him that he had the right to remain silent, that he had the right to have an attorney present at all times, and that anything he might say could be used against him in a subsequent prosecution."[2] Slattery asked defendant if he understood what he had been told; defendant said that he did.

Officer Slattery then searched defendant's person and found a pouch containing the "pseudo gold nuggets" which

---

[2] This *Escobedo-Dorado* warning (*Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]; *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]) conformed to the law applicable at the time of defendant's trial. The four-point *Miranda* warning

had been stolen in the Funaro burglary, several other items not identified in the testimony, and a key. According to the officer, he then had two ''conversations'' with defendant. One pertained to the nuggets. Slattery described the statements made by defendant in this conversation but, as will appear, his testimony concerning the entire conversation was later stricken. The second conversation related to a typewriter case which Slattery observed in the room where defendant went to get his jacket after the arrest. Slattery testified that there was a ''conversation'' in this regard, but did not describe the statements made by defendant concerning the typewriter case. It was not shown that the case was connected with the burglaries under investigation.

. Slattery then told defendant of the disclosures Taylor had made to the police. It does not appear that defendant made any reply. The officer next broached the subject of searching defendant's motel room. We observe at this point that there is no evidence that defendant had discussed the burglaries, as such, with Officer Slattery before they reached the subject of searching his motel room, and the evidence concerning any statements made by him before that point, and after receiving the *Escobedo-Dorado* warning, is both meager and uninformative.

Concerning the conversation which followed, Officer Slattery testified that ''I asked . . . defendant . . . if he would agree to a searching of his residence, if he had anything in his motel room that didn't belong to him. He stated that everything in the motel room belonged to him. . . . He stated, 'If I can go with you, you can search my motel room.' I asked him if the key that he had in his pocket was the key to his motel room. . . . It was laying on the seat of the police vehicle and I showed it to him and returned it to him.''

Officer Slattery further testified that he and his partner then drove defendant back to the motel at 11480 Ventura Boulevard in Los Angeles, where they arrived about one-half hour after the arrest in Burbank. According to the officer, they entered defendant's room after defendant himself had unlocked the door with the key which had been returned to him.

Defendant testified that a few questions were asked him when he was arrested, but that ''nothing was said about per-

(*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) was not required: defendant's trial commenced on April 8, 1966. (*People* v. *Rollins* (1967) 65 Cal.2d 681, 683, 691 [56 Cal.Rptr. 293, 423 P.2d 221].)

mission to search''; that the officers then took him directly to the motel; that the officers took the room key in the search of his person, but did not return it to him; and that one of them used the key to enter the motel room. He expressly denied that he had consented to the entry or to the search which followed.

The officers found some 37 items of property in the room, some of which—including Koosmann's clock and Funaro's stapler—had been stolen in the two burglaries. Contrary to his previous assertion that everything in the room was his, defendant told the police that the 37 items belonged to Bob Ward. Ward, he said, had asked him to keep the property. It was shown at the trial that the stolen items—except for the clock and the stapler—had been returned to their respective owners before the trial.

After hearing the *voir dire* testimony, the trial court ruled that defendant's arrest was unlawful because Officer Slattery had not had a warrant for the arrest and, acting upon information received from an unreliable informant (Taylor), had not had reasonable cause for the arrest; granted defendant's motion to suppress as evidence the gold nuggets found in the search of his person; and struck Officer Slattery's testimony concerning what he and defendant had said in their conversation concerning the nuggets at the time of the arrest. The court further found, however, that defendant had voluntarily and validly consented to the search of his motel room, and denied similar motions addressed (1) to the evidence that he had consented and (2) to the clock and stapler found in the search.

In the presence of the jury, Officer Slattery repeated his testimony concerning defendant's consent to the room search and the search itself. Defendant denied, to the jury, that he had consented to the search, and again gave his version of the search and his acquisition of the property found in his room. Over his objection, the trial court then admitted the clock and stapler in evidence. At the trial's conclusion, the court submitted to the jury the question whether defendant had—in fact and voluntarily—consented to the room search, but did not inform the jurors, by instruction or otherwise, that defendant's arrest had been illegal. The jury's verdict of ''guilty'' on the receiving counts indicates that it found against defendant on the consent issue.

Defendant contends on the appeal that the search of his room was unreasonable because it was conducted (1) without a warrant, (2) not as an incident to a lawful arrest, and

620

(3) without his consent: and that, since the search was unreasonable, the clock and stapler found in the room were constitutionally inadmissible in evidence. We agree.

The evidence clearly shows that the officers did not have a warrant to search the motel room, and the People do not contend to the contrary. Accordingly, the prosecution bore the burden of showing justification for the search. (*People* v. *Haven* (1963) 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927]; *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].) The burden could be met by a showing that the search was incident to a lawful arrest: i.e., a showing that, following a lawful arrest, the search went no further than those areas of the place of arrest which were under defendant's immediate control. (*People* v. *Cruz* (1964) 61 Cal.2d 861, 865-866 [40 Cal.Rptr. 841, 395 P.2d 889]; *People* v. *Shelton* (1964) 60 Cal.2d 740, 744 [36 Cal.Rptr. 433, 388 P.2d 665].)

Since defendant was arrested at the place of his employment in Burbank, and the room search was some distance away in Los Angeles,[3] the search would not be incident to the arrest even if the latter had been lawful. (*People* v. *Cruz, supra; People* v. *Shelton, supra.*) The prosecution, then, could meet its burden of justifying the search only by a showing that defendant freely consented to it. (*People* v. *Michael* (1955) 45 Cal.2d 751, 753 [290 P.2d 852].)

This burden was not met, because (1) the trial court found that defendant's arrest was *not* lawful, and (2) his consent to the search of his room was given—according to the prosecution's evidence, which he denied—while he was in custody immediately following it. "A search or seizure made pursuant to a valid consent before any illegal police conduct occurs is obviously not a product of illegal conduct. ▪ A search and seizure made pursuant to *consent secured immediately following an illegal . . . arrest,* however, is inextricably bound up with the illegal conduct and cannot be segregated therefrom." (Italics added.) (*People* v. *Haven, supra,* 59 Cal.2d 713, at p. 719 [disapproving prior decisions]; *People* v. *Johnson* (1968) 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921].) And defendant can assert the quoted rule on the appeal although at the trial he denied having con-

[3]The geographical distance between the two points was not shown, but the officers apparently required about 20 minutes to traverse it by automobile. The distance thus suggested is sufficient to invoke the *Cruz-. Shelton* rule cited.

sented to the search at all. (See *People* v. *Haven, supra,* at pp. 715, 718-719.)

The Attorney General urges that the evidence supports the trial court's and the jury's findings that defendant voluntarily consented to the room search, and that the connection between the illegal arrest and the consent had accordingly " 'become so attenuated as to dissipate the taint.' " (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 487 [9 L.Ed.2d 441, 455, 83 S.Ct. 407]; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 763-768 [44 Cal.Rptr. 313, 401 P.2d 921].) The "attenuation," it is argued, occurred because defendant gave the consent after having been given the *Escobedo-Dorado* admonition concerning his rights, including his right to remain silent. On this point, the Attorney General relies—and the trial court, confronted with the same point, explicitly relied—upon *People* v. *Martin* (1966) 240 Cal.App.2d 653 [49 Cal.Rptr. 888].)

In *Martin* the question was whether the defendant's confession was admissible where he had made it in custody after an illegal arrest. After Martin was arrested, he was taken to a sheriff's office. There he was given an *Escobedo-Dorado* warning and interrogated. After about one hour of interrogation, he made an admission; the confession followed. (*People* v. *Martin, supra,* 240 Cal.App.2d 653 at p. 655.) The reviewing court pointed out that the earlier rule of *People* v. *Freeland* (1963) 218 Cal.App.2d 199 [32 Cal.Rptr. 132]—that a confession was admissible if it was voluntary, although made in custody after an illegal arrest—had been modified, in effect, by the "tainted fruit" rule of *Wong Sun* and *Bilderbach* (*People* v. *Martin, supra,* at pp. 655-656) : but that the *Freeland* test of the *voluntariness* of the confession "remains a practical means for determining whether the connection between an illegal arrest and a confession has become so attenuated as to dissipate the taint or to overcome the 'reach of the fruits doctrine.' " (*Id.,* p. 656.)

The *Martin* court then stated that "Attenuation is brought about by intervening factors that abate or minimize the illegal arrest as the cause of the confession" and that "intervening events dissipated the taint" of Martin's illegal arrest because he had not confessed at the time of the arrest nor on the trip to the sheriff's office; because he did so voluntarily after having been given an *Escobedo-Dorado* warning at the second location; and because he "effectively, knowingly and intelligently" waived his rights when he "thereafter discussed the crime with the officers. . . ." (*Id.,* p. 657.) The court con-

cluded that "In view of these developments manifesting voluntariness, the illegal arrest was attenuated sufficiently to support the trial court's finding that the confession was voluntary, and admissible." (*Id.*)

Martin confessed at a point removed from the place of his arrest, some time later, and at least one hour after he had received an *Escobedo-Dorado* admonition and had evidenced an effective waiver of his rights by continuing to discuss the crime with the interrogating officers. In the present case defendant consented to the room search after having received a similar admonition, but at the place of his illegal arrest, in its immediate milieu, within minutes after both the arrest and the warning, and—as previously shown—without having engaged in any significant discussion of the crime with Officer Slattery.

As the *Martin* court pointed out, the " 'reach of the fruits doctrine' " is a question of fact to be determined in each case, and the element of time—while not universally decisive—can be a significant factor in determining whether "attenuation" has occurred. (*People* v. *Martin, supra,* 240 Cal.App.2d 653 at pp. 656, 657.) We conclude, therefore, that *Martin* and the present case are distinguishable upon their contrasting circumstances.

The thrust of the Attorney General's argument is that the *Escobedo-Dorado* warning alone was an attenuating factor which established the voluntariness of the consent and purged it of the "taint" of the illegal arrest. Under the logical extremity of this argument, any consent to a search, given after an illegal arrest, would be constitutionally effective if the warning had accompanied the arrest. This would mean, in practical effect, that the warning would legalize the arrest by validating its consequences. We cannot reconcile this prospect with the broadly stated rule that "A search and seizure made pursuant to consent secured immediately following an illegal . . . arrest, however, is *inextricably bound up with the illegal conduct and cannot be segregated therefrom.*" (Italics added.) (*People* v. *Haven, supra,* 59 Cal.2d 713 at p. 719; *People* v. *Johnson, supra,* 68 Cal.2d 629 at p. 632.)

The prosecution, relying upon defendant's consent to the search, has the burden of establishing that it was "not a mere submission to authority, and was not inextricably bound up with unlawful conduct." *People* v. *Johnson, supra,* 68 Cal.2d 629 at p. 632.) Under all the circumstances of the present case, the burden was not met by the showing that an *Escobedo-Dorado* warning was given. It follows that

the "taint" of the unlawful arrest persisted, the consent was ineffective, the search of defendant's motel room was unreasonable for lack of a valid consent, and the evidence seized in the room was inadmissible. (*Wong Sun* v. *United States, supra,* 371 U.S. 471 at pp. 487-488 [9 L.Ed.2d 441 at pp. 455-456] ; *People* v. *Bilderbach, supra,* 62 Cal.2d 757 at pp. 765-766.)[4]

As evidence of defendant's guilt of the receiving counts under which he was convicted, the clock and stapler seized in his motel room were indispensable to the prosecution's case. Their admission in evidence therefore requires reversal of the judgment. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].) The prospect of a retrial requires consideration of two further matters. The first relates to the trial court's ruling that defendant was illegally arrested in the first instance.

When making this ruling, the trial judge indicated that he considered the arrest to have been unlawful because Officer Slattery did not have a warrant to make it, because he was acting upon information received from Taylor, and because there was no showing that Taylor was a reliable informant. The ruling resulted in the exclusion of evidence favorable to the prosecution (the "pseudo gold nuggets" found in the search of defendant's person). Penal Code section 1252[5] ostensibly permits this court to review such a ruling upon request by the Attorney General.

However, we could not have determined that the ruling under discussion was erroneous because, had we held that it was and that defendant's consent to the search of his room was accordingly valid because it followed a *lawful* arrest, the determination would have required us to affirm the judgment.

 Penal Code section 1252 does not empower us, on a defendant's appeal, to overturn a trial ruling unfavorable to the prosecution where affirmance results. (*People* v. *Zelver*

---

[4]Defendant has also contended that his consent was ineffective because he was not advised that he had the right to refuse it. (See *People* v. *Henry* (1967) 65 Cal.2d 842, 846 [56 Cal.Rptr. 485, 423 P.2d 557]; *Parrish* v. *Civil Service Com.* (1967) 66 Cal.2d 260, 269-270 [57 Cal.Rptr. 623, 425 P.2d 223]; *People* v. *Campuzano* (1967) 254 Cal.App.2d 52, 58, et seq. [61 Cal.Rptr. 695] [dissent by Kingsley, J.]; *Gorman* v. *United States* (1st Cir. 1967) 380 F.2d 158, 164.) As we hold that the consent was ineffective as the "fruit" of his illegal arrest, we do not reach the alternative contention.

[5]"§ 1252. . . . On an appeal by a defendant, the appellate court shall, in addition to the issues raised by the defendant, consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General."

(1955) 135 Cal.App.2d 226, 236-237 [287 P.2d 183]. See Witkin, Cal. Criminal Procedure (1963), Appeal, § 688, pp. 671-672 and cases cited.) [6]

■ Thus, we are in effect bound by the trial court's ruling that defendant was unlawfully arrested. This does not, however, preclude a retrial, because our reversal of the judgment upon other grounds operates to reopen the question and the People may undertake at a retrial to prove that the arrest was lawful.

The second matter warranting mention in the event of retrial arises because in the present case the trial court, after making its own finding that defendant's consent to the search of his room was voluntary and effective to justify the search, submitted the same question to the jury with an instruction given by the court upon its own motion. Defendant has not contended that the submission of the consent issue to the jury was error, but that question is before us because he does urge that the instruction given was incomplete.

As authority for the instruction, the trial court cited *Castaneda* v. *Superior Court* (1963) 59 Cal.2d 439 [30 Cal.Rptr. 1, 380 P.2d 641]. The instruction given is accurate to the extent that it recites the holding of the *Castaneda* decision. ■ *Castaneda,* however, does not require that the issue whether a defendant validly consented to a search should be submitted to the jury after the court has determined it: and other cases hold that it should not. (*People* v. *Gorg* (1955) 45 Cal.2d 776, 780-781 [291 P.2d 469]; *People* v. *Anushevitz* (1960) 183 Cal.App.2d 752, 755 [6 Cal.Rptr. 785].) If at a retrial of the present case the court determines that defendant's arrest was lawful and that he voluntarily consented to the search of his room, the consent issue should not be submitted to the jury.

The appeal from the order denying a new trial is dismissed. The judgment of conviction is reversed.

Devine, P. J., and Christian, J., concurred.

A petition for a rehearing was denied August 30, 1968, and respondent's petition for a hearing by the Supreme Court was denied September 25, 1968. Mosk, J., was of the opinion that the petition should be granted.

---

[6]In response to an inquiry from this court, the Attorney General requested—for the record—that we review the ruling in question, but conceded that Penal Code section 1252 does not permit us to do so if affirmance would result.